NEDRICK JEFFREY HARDY, SR.,

   Plaintiff,

    v.

WEXFORD HEALTH SOURCES, INC.;
SALVADOR GODINEZ; MARCUS HARDY;
PARTHA GHOSH; IMHOTEP CARTER;
RONALD SCHAEFER; SALEH OBAISI;
RICHARD SHUTE; ARTHUR FUNK,

   Defendants.

No. 12 C 6554

Judge Thomas M. Durkin

## MEMORANDUM OPINION AND ORDER

Nedrick J. Hardy, Sr., an inmate in the custody of the Illinois Department of Corrections ("IDOC"), alleges that IDOC staff and medical service providers were deliberately indifferent to his medical needs in violation of the Eighth Amendment (Count I), and intentionally inflicted emotional distress upon him in violation of Illinois law (Count II), while he was incarcerated at Stateville Correctional Center in Crest Hill, Illinois. *See* R. 85.[1] Specifically, Hardy has sued IDOC Director, Salvador Godinez; Stateville's former warden, Marcus Hardy; the IDOC's medical services provider, Wexford Health Sources, Inc.; and doctors employed by Wexford, namely Dr. Partha Ghosh, Dr. Imhotep Carter, Dr. Ronald Schaefer, Dr. Saleh Obaisi, Dr. Richard Shute, and Dr. Arthur Funk. *See id.* Wexford and the individual

---

[1] Since May 21, 2014, Hardy has been incarcerated at Menard Correctional Center in Menard, Illinois. R. 85 ¶ 5.

doctors filed a motion to dismiss both counts for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), R. 91, which Warden Hardy and Director Godinez joined, R. 95. The Court appointed counsel for Hardy, and his counsel has prepared the amended complaint, *see* R. 85, and the brief opposing Defendants' motions. *See* R. 103. For the following reasons, the Court grants in part and denies in part Defendants' motion to dismiss.

## Legal Standard

A Rule 12(b)(6) motion challenges the sufficiency of the complaint. *See, e.g., Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). A complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), sufficient to provide defendant with "fair notice" of the claim and the basis for it. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). This "standard demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Aschcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While "detailed factual allegations" are not required, "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. The complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw a reasonable inference that the defendant is liable for the misconduct alleged." *Mann*, 707 F.3d at 877 (quoting *Iqbal*, 556 U.S. at 678). In applying this

standard, the Court accepts all well-pleaded facts as true and draws all reasonable inferences in favor of the non-moving party. *Mann*, 707 F.3d at 877.

**Background**

I.    **Hardy's Medical Conditions**

Hardy alleges that Defendants were deliberately indifferent to the following medical conditions he suffered while he was incarcerated at Stateville: (1) a broken right ring finger; (2) difficulty and pain urinating; (3) a damaged left eye; (4) an injured left shoulder; and (5) several mental illnesses. *See* R. 85.

1.    **Left Shoulder**

On October 16, 2009, Hardy injured his left shoulder when he fell while leaving the Stateville cafeteria. *Id.* ¶ 60. Hardy alleges that he "sent numerous request slips and grievances before being seen by a physician's assistant on November 23, 2009 for the shoulder injury." *Id.* ¶ 61. "Hardy continues to experience pain and has difficulty lifting heavy objects." *Id.* ¶ 62. Hardy does not allege anything else about his shoulder injury.

2.    **Difficulty and Pain Urinating**

Hardy initially sought medical attention for sharp pain in his side, kidney, thigh, and groin areas, and difficulties urinating on November 22, 2010 when he had an appointment with Dr. Ghosh. *Id.* ¶¶ 34-35. Dr. Ghosh took blood and urine samples and prescribed Hardy Tramadol for pain relief. *Id.* ¶ 35.

On January 18, 2011, Hardy had an appointment with Dr. Schaefer during which Hardy asked about the results of the blood and urine tests done by Dr.

Ghosh, but Dr. Schaefer "refused to look at the medical records from the earlier appointment." *Id.* ¶ 36. Dr. Schaefer proposed giving Hardy a rectal examination of his prostate during the appointment. *Id.* Hardy does not allege whether the proposed prostate examine was intended to address Hardy's urinary condition, but alleges that Dr. Schaefer did not "prescribe any treatment for Mr. Hardy's pain and difficulty urinating." *Id.*

On September 23, 2011, Hardy had an appointment with Dr. Carter during which he complained about his continuing pain. *Id.* ¶ 37. During this appointment "a catheter was discussed as a possible course of action but not prescribed." *Id.* Dr. Carter changed Hardy's pain-relief prescription from Tramadol to Naprosyn. *Id.*

On December 19, 2011, Hardy went to a "sick call" where he was seen by a physician's assistant and a medical technician who informed Hardy that they could not treat or prescribe anything for his symptoms and scheduled Hardy for an appointment with Dr. Carter in February 2012. *Id.* ¶ 38. Hardy also had an appointment with Dr. Carter on January 10, 2012. *Id.* ¶ 39. Hardy had a colonoscopy on June 26, 2012. *Id.* ¶ 43.

On October 22, 2012, Hardy had an appointment with Dr. Obaisi for his continued pain and inability to urinate. *Id.* ¶ 40. Dr. Obaisi prescribed him "the medication Hytrin." *Id.* That same day Hardy also had an urinalysis. *Id.* ¶ 43. Hardy again saw Dr. Obaisi on November 21, 2012 about continued abdominal pain, and Dr. Obaisi "prescribed a pain reliever." *Id.* ¶ 41.

Eleven days later on December 2, 2012, Hardy alleges he was unable to urinate for 24 hours. *Id.* ¶ 42. More than a month later, Hardy had an ultrasound of his abdomen on January 9, 2013. *Id.* ¶ 43. Hardy had another appointment with Dr. Obaisi on January 28, 2013, but Dr. Obaisi "did not provide Mr. Hardy with a diagnosis or change the treatment of Hytrin that Mr. Hardy was receiving." *Id.* ¶ 44. Hardy also had appointments with Dr. Obaisi on February 9, 2013, during which he was prescribed medications for indigestion and constipation, and on February 22, 2013, during which he again complained about groin pain and problems urinating. *Id.* ¶ 46. Dr. Obaisi "prescribed pain medication," and Hardy subsequently had a renal sonogram on April 30, 2013 and an urinalysis on May 22, 2013. *Id.* Hardy had a follow-up appointment with Dr. Obaisi on June 27, 2013, but Dr. Obaisi made no change in the medication Hardy was receiving. *Id.* ¶ 47.

Hardy makes no other allegation with respect to his abdomen pain or ability to urinate until December 20, 2013, when Hardy alleges that he was unable to urinate for approximately two days. *Id.* ¶ 48. Hardy then had another appointment with Dr. Obaisi on January 17, 2014, at which Dr. Obaisi instructed Hardy to take his Hytrin medication at a different time of day. *Id.* ¶ 49.

Hardy alleges that he "continues to experience severe pain in his side, kidney, thigh, and groin," "[o]n some occasions, he is unable to urinate for 30 to 40 hours," and "[h]e also has bloody stools during this period." *Id.* ¶ 50. He sums up his allegations with respect to this medical condition as follows:

> Naprosyn did not treat Mr. Hardy's pain as effectively as Tramadol had. Mr. Hardy has experienced high blood

> pressure, possibly a result of his inability to urinate consistently. Despite reporting these symptoms to prison and Wexford officials regularly for more than three years, Mr. Hardy did not receive a diagnosis, much less an effective treatment regimen, during his time at Stateville. (Defendant Obaisi included a declaration with a Wexford court filing in this case diagnosing Mr. Hardy with chronic prostatitis, but this diagnosis had never been communicated to Mr. Hardy. (D.I. 75.)) The medicine Hytrin treats some symptoms, including high blood pressure, but not the underlying causes. Mr. Hardy had anxiety that the difficulty urinating could be caused by a urinary tract infection, an enlarged prostate, or some other unknown cause, any of which could have caused additional health problems if left untreated.

*Id.*

### 3. Left Eye

Hardy also alleges that on May 10, 2011, he was poked in the eye and experienced pain and bleeding from his eyeball. R. 85 ¶ 53. The next day, Hardy saw Dr. Shute who referred Hardy to an ophthalmologist. *Id.* ¶ 54. Hardy saw the ophthalmologist the day after that, who prescribed an ointment and recommended a follow-up appointment in six months. *Id.* ¶ 55. Several days later on May 16, Dr. Shute also prescribed tinted glasses for Hardy. *Id.* ¶ 56. However, Dr. Shute did not provide Hardy with a permit for the glasses and they were confiscated by prison officials. *Id.* Hardy alleges that he continues to experience pain, blurred vision, and difficulty seeing out of his left eye, but that his requests for a follow-up with an ophthalmologist have gone unheeded. *Id.* ¶¶ 57-58.

### 4. Right Ring Finger

On May 15, 2012, Hardy's hand became "jammed in a weight machine in the gym, and a 180-pound weight fell on it." R. 85 ¶ 19. As a result, Hardy was unable to bend or straighten his right ring finger," and "was in serious pain." *Id.*

When Hardy visited the medical unit at the prison for treatment Dr. Shute and Dr. Funk observed Hardy's injured finger "in passing and remarked that it looked broken." *Id.* ¶ 22. However, Hardy did not receive treatment for his finger that day. *Id.* Hardy visited the medical unit again the next day and spoke with Dr. Shute, Dr. Funk, and Warden Hardy, but did not receive treatment. *Id.* ¶ 23.

The day after that, on May 17, Hardy had an appointment with Dr. Shute who scheduled an x-ray for May 21, 2012. *Id.* ¶ 24. Hardy alleges that the "x-ray revealed degenerative joint disease in Mr. Hardy's hand and wrist," but Dr. Shute "failed to diagnose or treat Mr. Hardy's right ring finger." *Id.*

On July 14, 2013, Hardy reinjured his right ring finger, and had an appointment with Dr. Obaisi on July 19, 2013. *Id.* ¶ 26. Dr. Obaisi took an x-ray of Hardy's hand, "which revealed the prior break in Mr. Hardy's right ring finger," but Dr. Obaisi "asserted that the break did not occur from the May 15, 2012 weight-room accident." *Id.*

Several weeks later in August 2013, Hardy had an appointment with Dr. Obaisi. *Id.* ¶ 27. Hardy alleges that Dr. Obaisi "promised to send Mr. Hardy to an orthopedist," but that this never happened. *Id.* Hardy also alleges that Dr. Obaisi

prescribed a brace for Hardy's right ring finger. *Id.* A nurse measured Hardy for the brace in September 2013. *Id.* ¶ 28.

The next month on October 13, 2013, Hardy had an appointment with Dr. Obaisi about "the continuing pain in his ring finger," and Dr. Obaisi diagnosed "a dislocated proximal interphalangeal (PIP) joint." *Id.* ¶ 29. Hardy alleges he again requested the prescribed brace on November 1 and 6, 2013, at appointments with nurses. *Id.* ¶ 30.

Hardy alleges he had another x-ray on December 25, 2013, and that he requested a brace during that appointment. *Id.* ¶ 31. Hardy alleges that he complained about his finger to a nurse on January 22, 2014, and that a "physician's assistant" told him at an appointment on February 6, 2014, that "the x-ray showed that [his] finger had been either newly fractured or refractured." *Id.* Hardy alleges that he never received a brace and has been prescribed only ibuprofen or acetaminophen for pain relief. *Id.* ¶ 32.

### 5. Mental Illness

Hardy alleges that he has been diagnosed with bipolar disorder, schizophrenia, and attention deficit disorder. R. 85 ¶ 64. He also alleges that he takes "numerous medications for these disorders," and he "regularly attends therapy sessions." *Id.*

Stateville was placed on lockdown for 17 days from June 10 through 27, 2012, and again for 23 days from July 11 through August 3, 2012. *Id.* ¶ 66. Hardy's mother passed away the day before the second lockdown. *Id.* ¶ 65. During the

lockdown periods, including the time immediately after his mother's death, Hardy alleges that he was prevented from visiting a health care clinic to renew his prescription medications for his mental illnesses and attend therapy sessions. *Id.* ¶ 66. His mother's death, combined with his inability to access medication or therapy, "caused Mr. Hardy to feel depressed, powerless, and helpless," *id.* ¶ 65, as well as "distressed and suicidal," *id.* ¶ 71.

Stateville was again placed on lockdown for most of June through September 2013, and Hardy was again prevented from visiting a health care clinic to renew his prescription medications and attend therapy sessions during this time. *Id.* ¶ 67. Hardy alleges that he experienced "unnecessary distress" and "physical pain" during these time periods without his prescription medications. *Id.* ¶¶ 68, 70.

Additionally, Hardy alleges Stateville does not permit inmates to renew their prescription medications until they have seven days' worth of medication remaining. *Id.* ¶ 72. He alleges that this policy harms him because "Stateville[] and Defedant Wexford's officials . . . frequently take longer than a week to order and provide prescription refills," which "frequently leaves inmates, including Mr. Hardy, without medication for days at a time." *Id.*

## II. Hardy's Grievance Filings

In addition to alleging that various Defendants had knowledge of Hardy's medical conditions through treatment they provided him, Hardy alleges that all Defendants (except Dr. Schaefer and Dr. Carter) "had knowledge of" of Hardy's "serious medical conditions and lack of access to adequate medical care, including

his complaints of side and groin pain, damaged eye, injured left shoulder, broken finger and degenerative joint disease, and lack of mental-health treatment," from the 21 grievances Hardy filed between November 27, 2010 and March 23, 2014. R. 85 ¶¶ 82-83, 86-87, 96-97, 116-17, 138-39, 156-57.[2] Hardy does not allege how he knows each particular defendant received his grievances. He also does not allege the specific content of any of the grievances he filed.

Hardy also alleges that Dr. Ghosh, Dr. Obaisi, Dr. Shute, and Dr. Funk each served as Stateville's medical director at various points during the time period of Hardy's allegations. *Id.* ¶¶ 7, 11-13. On this basis, as well as Hardy's grievances, Hardy alleges these four doctors "had knowledge of" the other defendant doctors' "failure to treat" Hardy's medical conditions. *Id.* ¶¶ 97, 117, 139, 157.

## Analysis

As an initial matter, Defendants argue that the complaint should be dismissed because it violates Federal Rule of Civil Procedure 10(b) by failing to allege specific counts against each defendant for conduct directly attributable to them. R. 92 at 1, 4. The Court agrees that alleging separate counts against each defendant would have made Hardy's complaint clearer and easier to address, both for Defendants and the Court. Nevertheless, the body of Hardy's complaint contains separate sections about each defendant and each injury that form the bases of

---

[2] Specifically, Hardy alleges he filed grievances on the following dates: November 27, 2010; January 18, 2011; February 14 and 15, 2011; April 8, 12, 14, 20 and 22, 2011; December 19, 2011; January 24, 2012; May 15 and 17, 2012; October 14, 2012; December 21, 2012; January 24, 28, and 30, 2013; February 26, 2013; April 5, 2013; and March 23, 2014. R. 85 ¶¶ 82, 86, 95, 115, 137, 155.

Hardy's claims against that defendant. In this way, the complaint provides sufficient notice to Defendants of Hardy's allegations in a manner that comports with the requirements of Federal Rules of Civil Procedure 8 and 10, and Hardy's claims are not dismissed on this basis.

**Count I – Deliberate Indifference**

In Count I, Hardy alleges that Defendants violated his civil rights because they knew of Hardy's serious medical conditions and "fail[ed] to respond" to Hardy's medical needs "in a timely and appropriate manner." R. 85 ¶ 1. "Prison officials violate the Eight Amendment's proscription against cruel and unusual punishment when they display deliberate indifference to serious medical needs of prisoners." *Hayes v. Snyder*, 546 F.3d 516, 522 (7th Cir. 2008). To establish a deliberate indifference claim under this standard premised upon inadequate medical treatment, a plaintiff must show (1) that the plaintiff suffered an objectively serious risk of harm, and (2) that the defendant acted with a subjectively culpable state of mind in acting or failing to act in disregard of that risk. *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011).

**A.    Objective Seriousness**

For a medical condition to satisfy the objective element, the condition must be "diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention." *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005). The "condition need not be life-threatening to be serious; rather, it could be a condition that would result in further significant injury

or unnecessary and wanton infliction of pain if not treated." *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010).

### 1. Mental Illness

Defendants do not contest the seriousness of Hardy's mental illnesses. R. 92 at 17-18. Even if Defendants did contest the seriousness of Hardy's mental illnesses, the Seventh Circuit has held that mental illnesses are an objectively serious medical conditions. *See Sanville v. McCaughtry*, 266 F.3d 724, 734 (7th Cir. 2001) ("The need for a mental illness to be treated could certainly be considered a serious medical need.").

### 2. Right Ring Finger

Defendants briefly challenge the seriousness of the injury Hardy's right ring finger, arguing that there are "no facts to suggest that [Hardy] was suffering from a serious medical condition," because it is not clear from Hardy's allegations whether the x-rays he received showed that his finger was in fact broken. *See* R. 92 at 8. Hardy clearly alleges, however, that his right ring finger was so obviously broken that Dr. Shute and Dr. Funk remarked in passing it looked broken, R. 85 ¶ 22, that Dr. Shute diagnosed Hardy with degenerative bone disease, *id.* ¶ 24, and that Dr. Obaisi ordered a referral to an orthopedist and diagnosed Hardy with a dislocated finger, *id.* ¶¶ 27, 29. Whether Hardy's finger was actually broken, merely dislocated, or at greater risk of being broken in the future, Hardy's allegations allow the Court to reasonably infer that Hardy suffered from a serious medical condition as his future ability to use his finger was implicated. *See Edwards v. Snyder*, 478

F.3d 827, 831 (7th Cir. 2007) (prisoner's openly dislocated finger was a serious medical condition); *Duncan v. Duckworth*, 644 F.2d 653, 654 (7th Cir. 1981) (broken wrist was a serious medical condition).

### 3. Pain and Difficulty Urinating

Defendants also briefly remark that Hardy has not alleged "any acute distress or pain" in regards to his alleged urinary issues. R. 92 at 9-11, 13-14. Other than this comment, Defendants have provided no analysis on the seriousness of these medical conditions. It is not the Court's responsibility to make a party's argument for it. *See Costello v. Grundon*, 651 F.3d 614, 639 n.7 (7th Cir. 2011) (quoting *Vaughn v. King*, 167 F.3d 347, 354 (7th Cir. 1999) ("It is not the responsibility of this Court to make arguments for the parties.")).

In any event, Hardy's allegations that he experienced an inability to urinate for over a day at a time, bloody stools, and sharp pain in his side, kidney, thigh, and groin areas are "so obvious" that a lay person would perceive the need for a doctor's attention. *Greeno*, 414 F.3d at 653; *see also De La Paz v. Peters*, 959 F. Supp. 909, 914 (N.D. Ill. 1997) (urinary and bowel incontinence are serious medical conditions). Certainly, the inability to urinate "could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated," *Gayton*, 593 F.3d at 620, and is a condition for which "even a lay person would perceive the need for a doctor's attention." *Greeno*, 414 F.3d at 653. Hardy's allegations allow the Court to reasonably infer that Hardy's pain and difficulty urinating is a serious medical condition.

### 4.    Left Eye

Defendants provide more analysis regarding the seriousness of Hardy's damaged left eye. Specifically, Defendants argue that the ophthalmologist did not find that Hardy was suffering from a serious medical condition because the ophthalmologist "prescribed an ointment and recommended a follow-up appointment in six months." R. 92 at 15. The fact that the prescribed treatment appears simple, however, does not necessarily mean that Hardy's eye injury was not "serious." Hardy has alleged that he experienced pain, bleeding, and blurry vision after being poked in the eye. The Seventh Circuit has found similar allegations of eye injuries to be "serious." *See Ortiz v. Webster*, 655 F.3d 731, 734 (7th Cir. 2011) (finding inmate's diagnosis of pterygia, which interfered with inmate's vision, a "serious" medical condition); *Castillo v. United States*, 44 Fed. App'x 732, 734 (7th Cir. 2002) (finding an inmate's pain, infection, discharge, and loss of vision in his right eye a "serious" medical condition). Hardy's allegations allow the Court to reasonably infer that Hardy's damaged left eye is a serious medical condition.

### 5.    Left Shoulder

Defendants argue that Hardy's shoulder injury is not serious because he only alleges that he experiences pain when "lifting heavy objects." R. 92 at 16 (citing R. 85 ¶ 62). The Court agrees that Hardy's allegations do not permit the inference that his injured left shoulder is a "serious" medical condition. Hardy's allegations do not enable the Court to reasonably infer that his shoulder injury will "result in further significant injury or unnecessary and wanton infliction of pain if not treated."

*Gayton*, 593 F.3d at 620. "[N]ot 'every ache or pain' is sufficient to constitute a serious medical need." *Slate v. Lemens*, 400 Fed. App'x 109, 112 (7th Cir. 2010) (quoting *Gutierrez v. Peters*, 111 F.3d 1364, 1372 (7th Cir. 1997)). Rather, "ailments for which many people who are not in prison do not seek medical attention" cannot form the basis of a constitutional violation. *Cooper v. Casey*, 97 F.3d 914, 916 (7th Cir. 1996). Moreover, Hardy does not mention his shoulder in his brief opposing this motion, let alone address Defendants' arguments on this issue. Accordingly, not only has Hardy failed to sufficiently allege a serious shoulder injury, the Court considers Hardy to have abandoned any claim based on his shoulder.[3]

## B.    Personal Involvement and Supervisory Liability

The subjective element of a deliberate indifference claim cannot be premised upon a theory of respondeat superior. *See Arnett v. Webster*, 658 F.3d 742, 757 (7th Cir. 2011). Instead, a plaintiff's allegations against a prison official can only satisfy "the personal responsibility requirement of section 1983 if the conduct causing the constitutional deprivation occurs at [the official's] direction or with his knowledge and consent." *Id.* "That is, [the official] must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye." *Id.* "In short, some causal connection

---

[3] Defendants also argue that Hardy's claims with respect to his shoulder are time-barred because Hardy first injured his shoulder on October 16, 2009, and sought treatment on November 23, 2009. *See* R. 92 at 16-17. Defendants are correct that a two-year statute of limitations applies here, but "the two-year period starts to run (that is, the cause of action accrues) from the date of the last incidence of [the] violation, not the first." *See Turley v. Rednour*, 729 F.3d 645, 651 (7th Cir. 2013). Hardy alleges that he continues to experience pain to this day. For this reason, the Court will not dismiss the claim as time-barred, but rather the claim is dismissed for the reasons stated above.

or affirmative link between the action complained about and the official sued is necessary for § 1983 recovery." *Id.* Thus, although a prison official is "entitled to relegate to the prison's medical staff the provision of good medical care," *Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009), "nonmedical officials can be chargeable with . . . deliberate indifference where they have a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner." *Arnett*, 658 F.3d at 755.

### 1. Warden Hardy and Director Godinez's Personal Involvement

Hardy only alleges that Warden Hardy and Director Godinez had notice of his medical conditions and treatment from the grievances he filed. He does not allege that Warden Hardy or Director Godinez took any action that prevented Hardy from receiving adequate medical care. Absent allegations of such causal conduct, Hardy's allegations are insufficient to state a claim. *See Owens v. Hinsley*, 635 F.3d 950, 953 (7th Cir. 2011) ("[T]he alleged mishandling of Owens's grievances by persons who otherwise did not cause or participate in the underlying conduct states no claim."); *see also George v. Smith*, 507 F.3d 605, 609 (7th Cir. 2007) ("Ruling against a prisoner on an administrative complaint does not cause or contribute to the violation."); *Neely v. Randle*, 2013 WL 3321451, at *3 (N.D. Ill. June 29, 2013) ("If there is 'no personal involvement by the warden [in an inmate's medical care] outside the grievance process,' that is insufficient to state a claim against the warden." (quoting *Gevas v. Mitchell*, 492 Fed. App'x 654, 660 (7th Cir. 2012))).

For written notice to prison administrators to form the basis of a deliberate indifference claim, the plaintiff "must demonstrate that the communication, in its content and manner of transmission, gave the prison official sufficient notice to alert him or her to an excessive risk to inmate health or safety." *Arnett*, 658 F.3d at 755. Hardy fails to allege the content of the grievances he sent to Warden Hardy and Director Godinez. Moreover, Hardy alleges he received regular appointments with doctors, a number of medical tests, and medication prescriptions in an attempt to address his medical conditions. It may be that Hardy has sufficiently alleged that some of this treatment fell below a constitutionally adequate level. The Court addresses this issue below. But in the absence of allegations that Hardy was "completely ignored by medical staff," *Arnett*, 658 F.3d at 755-56, Warden Hardy and Director Godinez were entitled to rely on the medical judgments supporting the treatments Hardy alleges he received. *See id.* ("If a prisoner is under the care of medical experts . . . a non-medical prison official will generally be justified in believing that the prisoner is in capable hands."). The Seventh Circuit has affirmed district court dismissals of similar allegations. *See Adams v. Durai*, 153 Fed. App'x 972, 975 (7th Cir. 2005) ("An administrator does not become responsible for a doctor's exercise of medical judgment simply by virtue of reviewing an inmate grievance, and that is all [the plaintiff] alleges here."); *Greeno*, 414 F.3d at 655-56 ("We do not think [the prison official's] failure to take further action once he had referred the matter to the medical providers can be viewed as deliberate

indifference.").[4] Accordingly, Hardy's claims against Warden Hardy and Director Godinez are dismissed.[5]

### 2. Dr. Shute, Dr. Funk, and Dr. Obaisi's Supervisory Liability

Hardy alleges that Dr. Shute "served as . . . Medical Director at Stateville," R. 85 ¶ 12, and due to his position was "ultimately responsible for all health care delivered at Stateville." *Id.* ¶ 131. Hardy also alleges that Dr. Funk was aware of the inadequate treatment Hardy was receiving from other doctors because he "served as . . . Regional Medical Director." *Id.* ¶ 13. And similarly, Hardy alleges that Dr. Obaisi "is currently . . . the Medical Director at Stateville." *Id.* ¶ 11. Hardy alleges that due to Dr. Shute, Dr. Funk, and Dr. Obaisi holding supervisory medical positions, along with the grievances Hardy filed, they were aware of the inadequate

---

[4] *See also Brown v. Wexford Health Sources.*, 2014 WL 257552, at *3 (N.D. Ill. Jan. 23, 2014) ("[The Warden's] refusal to consider two emergency grievances as emergencies, which is all Plaintiff's complaint alleges even under a liberal construction, by itself, does not indicate that [the Warden] caused or participated in Plaintiff's alleged inadequate medical care and does not state a claim."); *Foster v. Ghosh*, 2013 WL 3790905, at *4 (N.D. Ill. July 19, 2013) ("[The Warden] is not liable under the doctrine of deliberate indifference for simply serving in his administrative role at the Stateville Correctional Center."); *cf. Jones v. Drew*, 221 Fed. App'x 450, 454 (7th Cir. 2007) (affirming a grant of summary judgment because "[a]lthough [the plaintiff] mailed a complaint to [the Warden] and filed a grievance at [the prison] describing his frustration with his treatment, there is no evidence that [the Warden] personally received or read these communications since he delegated the review of prisoner complaints to others within his office."); *Johnson v. Snyder*, 444 F.3d 579, 584 (7th Cir. 2006) (affirming a grant of summary judgment because "[t]he fact that [the plaintiff] sent a letter or letters to [the IDOC Director] is insufficient to create a genuine issue of material fact regarding defendant Snyder.").

[5] Additionally, Warden Hardy's tenure at Stateville ended on December 31, 2012, and Director Godinez did not assume his position until May 5, 2011. *See* R. 104 at 3-4. Should Hardy refile amended claims against Warden Hardy and Director Godinez he should take these dates into account in making any allegations regarding their personal conduct.

treatment Hardy was receiving from other doctors but "took no action to ensure that Mr. Hardy received adequate medical care and treatment." *Id.* ¶ 147.

### a. Failure to Ensure Adequate Treatment by Other Doctors

Dr. Shute, Dr. Funk, and Dr. Obaisi argue that a "prison official cannot be held liable simply based upon his or her position." R. 105 at 8; R. 92 at 3-5.[6] It is true that respondeat superior liability is not available for a claim under § 1983. Hardy, however, does not use the mere fact of the three doctors' titles to establish their liability. Rather, Hardy alleges that they had knowledge of the inadequate treatment Hardy was receiving due to their supervisory positions as head medical officers. In this way, Hardy's allegation is quite different from the allegations against Warden Hardy and Director Godinez, which the Court has already dismissed. Dr. Shute, Dr. Funk, and Dr. Obaisi were not merely responsible for prison administration generally, but were responsible for medical care in particular. This allegation is enough for the Court to infer that Dr. Shute, Dr. Funk, and Dr. Obaisi knew about any inadequate care Hardy received during their terms as Medical Director and did nothing to remedy the situation. This is sufficient to state claims against them based on any well-pleaded allegations of underlying inadequate

---

[6] Hardy also alleges that Dr. Ghosh is liable for the other doctors' failures to treat Hardy's medical conditions. The Court has dismissed Hardy's claims regarding his shoulder pain, and the Court addresses Dr. Ghosh's potential liability for Hardy's pain and difficulty urinating below. The earliest Hardy ever allegedly raised any of his other medical conditions was May 10, 2011, when he was poked in the eye. Since Dr. Ghosh retired at the end of March 2011, Dr. Ghosh cannot be liable for the alleged lack of treatment of Hardy's injuries that occurred after this date, and any such claim is dismissed.

care. The Court will address whether Hardy's allegations regarding the care he received are sufficient to state a claim below.

### b.   Failure to Intervene Regarding Stateville's Policies

Hardy also alleges that Dr. Shute, Dr. Funk, and Dr. Obaisi had knowledge of Hardy's "lack of adequate mental-health treatment." R. 85 ¶¶ 116-17, 138-39, 156-57. As Hardy also alleges, however, these alleged failures in care were the result of Wexford and Stateville's policies. Hardy does not allege how Dr. Shute, Dr. Funk, and Dr. Obaisi had knowledge of the effect of these policies, or that they had the opportunity to change them. Absent additional allegations regarding their knowledge of the policies, and their role in creating and enforcing them, the Court cannot reasonably infer that Dr. Shute, Dr. Funk, and Dr. Obaisi had any personal involvement in any injury Hardy allegedly suffered as a result of these policies.

### C.   The Doctors' Actions

The subjective element of a deliberate indifference claim requires the plaintiff to show that a defendant acted or failed to act "despite his knowledge of a substantial risk of serious harm" to the inmate. *Farmer*, 511 U.S. at 842. In the prison context, "medical professionals . . . are entitled to deference in treatment decisions unless no minimally competent medical professional would have so responded under the circumstances at issue." *McGee v. Adams*, 721 F.3d 474, 481 (7th Cir. 2013). "When a medical professional acts in his professional capacity, he may be held to have displayed deliberate indifference only if the decision by the professional is such a substantial departure from accepted professional judgment,

practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id.* This standard—"akin to criminal recklessness," *Williams v. Fahim*, 572 Fed. App'x 445, 448 (7th Cir. 2014)—is high enough such that "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner," but is not so high that the plaintiff is "required to show that he was literally ignored." *King v. Kramer*, 680 F.3d 1013, 1019 (7th Cir. 2012). A prison doctor may exhibit deliberate indifference to a known condition (i) "through inaction," (ii) "by persisting with inappropriate treatment," or (iii) "by delaying necessary treatment and thus aggravating the injury or needlessly prolonging an inmate's pain." *Gatson v. Ghosh*, 498 Fed. App'x 629, 631-32 (7th Cir. 2012).

Hardy alleges that the treatment he received from each of the six doctor defendants was constitutionally deficient. The Court will address the alleged conduct of each doctor in turn.

### 1.    Dr. Ghosh

In response to Hardy's complaints of "sharp pain in his side, kidney, thigh, and groin, accompanied by difficulty urinating, sometimes for multiple days at a time," Dr. Ghosh "took blood and urine samples for testing . . . [and] prescribed Tramadol for pain relief" on November 22, 2010. R. 85 ¶¶ 34-35. Hardy alleges that Dr. Ghosh was deliberately indifferent to his side and groin pain and difficulty urinating because Dr. Ghosh "did nothing with the results of the tests he took, and he made no effort to treat the underlying cause of Mr. Hardy's pain." R. 103 at 13.

Dr. Ghosh argues that "[b]ecause [he] evaluated [Hardy], and there are no facts suggesting that Dr. Ghosh otherwise acted with deliberate indifference, Dr. Ghosh is entitled to dismissal." R. 105 at 3. But this argument ignores the allegations from which the Court can reasonably infer that Hardy continued to complain about pain and difficulty urinating without a follow-up from Dr. Ghosh. Hardy alleges that he asked Dr. Schaefer about the tests Dr. Ghosh ordered on January 18, 2011 (two months after he saw Dr. Ghosh), and that he filed grievances on February 14 and 15, 2011. Dr. Ghosh retired at the end of March 2011, and Hardy alleges that neither Dr. Ghosh nor any other doctor addressed Hardy's pain and difficulty urinating between the time he saw Dr. Ghosh and Dr. Ghosh's retirement. Dr. Ghosh's action to order tests and prescribe a pain reliever on November 22, 2010, does not insulate him from liability for inadequate care over the ensuing four months. *See Arnett*, 658 F.3d at 751 ("some treatment does not foreclose his deliberate indifference claim if the treatment received was so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate the condition"). Particularly in light of Dr. Ghosh's position as Medical Director during this time period, Hardy's allegations that Dr. Ghosh ignored Hardy's continued complaints about pain and difficulty urinating are sufficient to state a claim for deliberate indifference.

## 2. Dr. Schaefer

Hardy alleges that he had one appointment with Dr. Schaefer on January 18, 2011, during which Hardy asked about the results of blood and urine tests Dr.

Ghosh ordered on November 22, 2010. R. 85 ¶ 107. Hardy contends in his brief that he "personally made Dr. Schaefer aware of [his] pain and difficulty urinating." R. 103 at 13. Hardy argues that Dr. Schaefer was deliberately indifferent to Hardy's urinary condition because Dr. Schaefer refused to provide Hardy with his test results, and "in refusing to treat [Hardy's urinary condition] (or even discuss it with Mr. Hardy at all) and in sending Mr. Hardy out of his office." *Id.* Dr. Schaefer did suggest a rectal examination of Hardy's prostate, R. 85 ¶ 107, but it is unclear whether this was intended to address Hardy's urinary condition. Dr. Schafer contends that the appointment was specifically for the prostate exam, and had nothing to do with Hardy's urinary condition. *See* R. 92 at 10.

Hardy does not expressly allege that he described his pain and difficulty urinating to Dr. Schaefer. But it is reasonable to infer that he did so since he asked about the results of the test Dr. Ghosh had ordered in response to such complaints. Furthermore, although Dr. Schaefer suggested a prostate exam, Dr. Schaefer contends that this treatment was unrelated to Hardy's urinary condition. Dr. Schaefer argues that because he saw Hardy for "an unrelated ailment," he had no obligation to address any other serious medical condition. *See* R. 92 at 10. But there is no authority supporting Dr. Schaefer's conclusion, which is illogical on its face. In a prison setting, where getting an appointment with a doctor can sometimes take months, a medical professional cannot ignore a complaint about a serious medical ailment just because the appointment is for a different purpose. It may be entirely appropriate for the doctor to arrange for another appointment due to time

constraints the day of the initial appointment. But ignoring the condition is not appropriate. Hardy has alleged that Dr. Schaefer knew that Hardy was suffering from a serious medical condition—pain and difficulty urinating—and refused to treat it. This is all that is necessary to state a claim for deliberate indifference. Accordingly, the Court denies Dr. Schaefer's motion to dismiss Count I against him.

### 3. Dr. Carter

Hardy saw Dr. Carter regarding Hardy's continuing pain and difficulty urinating on September 23, 2011, and Dr. Carter changed Hardy's medication. Hardy alleges he tried to see Dr. Carter again on December 19, but was only able to schedule an appointment for February 2012. Prior to the scheduled appointment, Hardy saw Dr. Carter on January 10, 2012. Hardy alleges Dr. Carter did not change Hardy's treatment despite Hardy's allegation that he "continued experiencing severe pain in his side, kidney, thigh, and groin," and "[o]n some occasions, he was unable to urinate for 30 to 40 hours," and experienced "bloody stools during this period." R. 85 ¶ 105. Hardy also filed grievances during this time period on December 19, 2011, and January 24, 2012.

Dr. Carter argues that his failure to "provide [Hardy] with a diagnosis" during the January 10, 2012 appointment does not constitute deliberate indifference. *See* R. 92 at 11. Dr. Carter also cites Hardy's allegations of treatment he received in June and October 2012, and January 2013, as contradicting Hardy's claim of deliberate indifference. *Id.* Dr. Carter also argues that his failure to change Hardy's treatment in January 2012 does not support a claim of deliberate

indifference because it is based on the "speculat[ion] that [Hardy's] condition could have resulted in him being pain free if Dr. Carter had provided him with stronger medication." R. 105 at 7.

By January 10, 2012, however, Hardy had been complaining of pain and difficulty urinating for more than a year. He had been prescribed two different pain medications, and neither had alleviated his pain. The Court can infer from these allegations that it was unreasonable for Dr. Carter to stay the course. *See Arnett*, 658 F.3d at 754 (allegation that doctor continued with courses of treatment he knew to be ineffective sufficiently state a claim for deliberate indifference). Treatment that Hardy received months later in June and October 2012, and January 2013, does not change the fact (as alleged) that Dr. Carter took inadequate action in January 2012 when he prescribed Hardy the same medication he had been taking for several months, which had allegedly proved ineffective, and took no further action. Accordingly, the Court denies Defendants' motion to dismiss Dr. Carter from Count I.

### 4. Dr. Shute

#### a. Dr. Shute's Treatment of Hardy's Left Eye

Hardy argues that Dr. Shute was deliberately indifferent to his eye injury because, on May 16, 2011, Dr. Shute prescribed tinted glasses but failed to provide Hardy with a permit for the glasses, which resulted in the glasses being confiscated. *See* R. 103 at 10. The primary problem with Hardy's argument is that Hardy has not alleged that Dr. Shute was aware that Hardy's glasses had been confiscated.

Hardy does not allege that he tried to inform Dr. Shute about this problem, and the first grievance Hardy alleges he filed after his glasses were confiscated was on December 19, 2011, more than six months after Dr. Shute prescribed the glasses on May 16, 2011. Absent an allegation that Dr. Shute knew Hardy had been deprived of his glasses, Hardy's claim against Dr. Shute based on the treatment he provided for Hardy's injured eye must be dismissed.

Moreover, Hardy's allegation that deprivation of the tinted glasses constituted deliberate indifference is not plausible. The ophthalmologist did not prescribe tinted glasses for Hardy. If a specialist did not think it necessary to prescribe such glasses it is illogical to infer that a failure by Dr. Shute to prescribe such glasses could constitute a "substantial departure from accepted professional judgment." *McGee*, 721 F.3d at 481. Even though Dr. Shute failed to provide Hardy with a permit to ensure that he would be permitted to keep his glasses, this alleged deprivation cannot form the basis of a deliberate indifference claim.

Additionally, Hardy alleges that Dr. Shute was deliberately indifferent because Hardy never had a follow-up appointment about his eye, even though Hardy "has filed numerous requests for the recommended follow-up." R. 85 ¶ 57. But Hardy does not allege that he continues to suffer from a serious injury to his eye. Instead, Hardy alleges that he "periodically" experiences "blurry" vision, and "[b]right lights hurt his eyes." *Id.* ¶ 58. Bright lights are painful for all people, and episodes of "periodic" "blurry" vision occurring years after Hardy's initial injury is too vague an allegation to support a claim for a serious injury. Furthermore,

Hardy's allegation that he has frequently sought a follow-up examination for his eye is belied by Hardy's allegation that he did not file any grievances between May 10, 2011, when he injured his eye, and December 19, 2011, which is the day he attempted to see Dr. Carter about his urinary condition. Hardy's allegation that he continued to suffer from a serious injury and seek treatment for it is implausible in light of his allegation that he did not file any grievances during the relevant time period. Accordingly, Hardy's claim for deliberate indifference based on Dr. Shute's treatment of his eye injury is dismissed.

### b.        Dr. Shute's Treatment of Hardy's Right Ring Finger

Hardy alleges that Dr. Shute was deliberately indifferent because he waited two days to examine Hardy's finger, did not schedule an x-ray until four days after that, and then failed to treat the finger any further. With respect to the delay, Hardy does not allege that it caused him additional pain. Absent such an allegation, a doctor's decision regarding scheduling of treatment cannot support a deliberate indifference claim. *See Johnson v.* Sango, 1996 WL 67704, at *2 (7th Cir. 1996) ("Although [the plaintiff] did allege some delay in the taking of his x-rays, [the plaintiff's] alleged back and shoulder pain was not of the severity to require immediate medical attention and thus it was reasonable for [the doctor] to delay treatment until she had seen the x-rays."); *cf. Davis v. Samalio*, 286 Fed. App'x 325, 328 (7th Cir. 2008) ("[The plaintiff] presented no competent medical evidence supporting the theory that the eight-day delay in procuring a second round of x-rays had a detrimental effect on his fractured wrist."); *Langston v. Peters*, 100 F.3d 1235,

1240 (7th Cir. 1996) ("[a]n inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed").

The delay is particularly innocuous here because Hardy's allegations permit the reasonable inference that Hardy's finger was not broken during the May 15 weight-room accident. Although Hardy alleges that his finger was broken, he also alleges that the doctors treating his finger told him it was not broken during that incident. Hardy alleges that Dr. Shute told him that the x-ray revealed that he had degenerative bone disease, and, based on a subsequent x-ray, Dr. Obaisi told him that a "prior break" in his right ring finger "did not occur from the May 15, 2012 weight-room accident." R. 85 ¶ 26. Since Hardy's allegations reveal that his finger was not actually broken on May 15, 2012, Dr. Shute's failure to provide further treatment after the x-ray cannot support a claim of deliberate indifference.

5.    **Dr. Funk**

Hardy alleges that after he injured his finger in the weight room and visited the medical unit, Dr. Funk "saw [his] right ring finger in passing and remarked that it looked broken," but failed to treat the finger. R. 85 ¶ 159. The Court has already discussed, however, that Dr. Shute subsequently treated Hardy's finger. Clearly, Hardy's allegation that Dr. Funk failed to immediately treat Hardy's finger cannot state a claim for deliberate indifference when Hardy later received treatment from a different doctor in a manner the Court has held did not constitute deliberate indifference.

### 6. Dr. Obaisi

#### a. Dr. Obaisi's Treatment of Hardy's Right Ring Finger

Hardy reinjured his right ring finger on July 14, 2013, which Dr. Obaisi treated over the next several months. Dr. Obaisi took the following actions: (1) ordered an x-ray on July 19, 2013; (2) ordered a referral to an orthopedist in August 2013; (3) prescribed a brace in August 2013; and (4) diagnosed Hardy with a "dislocated proximal interphalangeal (PIP) joint" on October 13, 2013. Hardy also had another x-ray in December 2013. Despite Dr. Obaisi's prescriptions and orders, Hardy alleges that he never saw an orthopedist, never received a brace, and only received ibuprofen and acetaminophen for his pain.

Dr. Obaisi's actions indicate that he was aware that Hardy had a serious injury to his finger and required medical treatment. But Hardy alleges that Dr. Obaisi failed to follow through on his prescriptions and diagnoses despite at least two follow-up appointments in August and October 2013 during which Dr. Obaisi would have known that Hardy had not seen an orthopedist or received the prescribed brace.

Dr. Obaisi argues that he is not responsible for the fact that his orders were not carried out, and that Hardy has not alleged that Dr. Obaisi was aware of Hardy's continuing complaints in December 2013 and January and February 2014. These later complaints notwithstanding, Hardy alleges that he had appointments with Dr. Obaisi in July, August, and October 2013. In October 2013 when Hardy had not seen an orthopedist or received a brace nearly three months after the

29

original injury, Dr. Obaisi was on notice that Hardy was not receiving the care Dr. Obaisi had determined was necessary to treat Hardy's finger. Even assuming that Dr. Obaisi's orders were medically adequate—and Hardy has not alleged that they were deficient—Dr. Obaisi's failure to ensure that Hardy received this treatment states a claim for deliberate indifference.

### b. Dr. Obaisi's Treatment of Hardy's Difficulty and Pain Urinating

Hardy argues that Dr. Obaisi was deliberately indifferent to his urinary condition because "Dr. Obaisi never effectively treated Mr. Hardy." R. 103 at 8. But an allegation of merely ineffective treatment is insufficient to state a claim for deliberate indifference. *King*, 680 F.3d at 1019 ("[M]edical malpractice does not become a constitutional violation merely because the victim is a prisoner." (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976))).

Hardy also argues that "Dr. Obaisi's ongoing failure to adjust the treatment to effectively treat Mr. Hardy states a claim for inadequate medical care." R. 103 at 8-9. But Hardy's allegations belie this argument. Beginning on October 22, 2012, Dr. Obaisi saw Hardy about his urinary condition or prescribed a test or procedure for Hardy nearly every month through June 27, 2013. After Hardy's appointment with Dr. Obaisi on June 27, Hardy's next allegation of pain related to his urinary condition did not occur until December 20, 2013. Hardy then saw Dr. Obaisi on January 17, 2014, at which time Dr. Obaisi recommended that Hardy alter the time of day when he took his medication. Although this recommendation seems minimal, it is nevertheless an attempt to address Hardy's complaints. The Court is not

permitted to second-guess a physician's actions, but rather must ensure the physician is taking some action. Especially in light of Dr. Obaisi's varied efforts to address Hardy's condition leading up to his last recommendation on January 17, the Court cannot reasonably infer that Dr. Obaisi was indifferent to Hardy's complaints. (By contrast, Hardy alleges that Dr. Carter changed Hardy's medication once, but then did nothing at an appointment several months later despite Hardy's continued complaints of pain.)

Hardy's allegations clearly demonstrate that he is suffering from a serious urinary condition. But his allegations also demonstrate that Dr. Obaisi was working to address that condition. It may be that Dr. Obaisi's treatment was ineffective or unsuccessful. Such allegations, however, do not state a claim for deliberate indifference.

### D. Wexford's Actions

In addition to his claims against the individual defendants, Hardy alleges that Wexford has customs or practices that deny prisoners with serious medical conditions adequate medical care. *See* R. 85 ¶¶ 74-80; R. 103 at 18. "A local governing body may be liable for monetary damages under § 1983 if the unconstitutional act complained of is caused by: (1) an official policy adopted and promulgated by its officers; (2) a governmental practice or custom that, although not officially authorized, is widespread and well settled; or (3) an official with final policy-making authority." *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010) (citing *Monell v. Dep't of Soc. Servs. of the City of N.Y.*, 436 U.S. 658,

690 (1978)). Like municipalities, "[p]rivate corporations acting under color of state law may [also] . . . be held liable for injuries resulting from their policies and practices." *Rice v. Correctional Med. Servs. of Ill., Inc.*, 675 F.3d 650, 675 (7th Cir. 2012); *see also Shields v. Ill. Dep't of Corrections*, 746 F.3d 782, 789 (7th Cir. 2014) ("Most defendants under § 1983 are public employees, but private companies and their employees can also act under color of state law and thus can be sued under § 1983."). To claim *Monell* liability, a plaintiff must allege "that the [entity] policymakers were deliberately indifferent as to [the] known or obvious consequences." *Thomas*, 604 F.3d at 303. "In other words, they must have been aware of the risk they created by the custom or practice and must have failed to take appropriate steps to protect the plaintiff." *Id.*

"[T]here is no clear consensus as to how frequently [certain] conduct must occur to impose *Monell* liability [under the custom and practice theory], except that it must be more than one instance, or even three." *Id.* (internal quotation marks and citations omitted). While the number of incidents is relevant to whether an implicit policy exists, the Seventh Circuit has made clear that, absent an express policy, *Monell* liability is only appropriate where the "plaintiff [can] introduce evidence demonstrating that the unlawful practice was so pervasive that acquiescence on the part of policymakers was apparent and amounted to a policy decision." *Phelan v. Cook Cnty.*, 463 F.3d 773, 790 (7th Cir. 2006) (the evidence must be such that the plaintiff can "weave . . . separate incidents together into a cognizable policy"). Additionally, for an entity to be liable, the causal relationship between the policy or

practice and the harm must be such that the policy was the "moving force behind the constitutional violation." *City of Canton v. Harris*, 489 U.S. 378, 389 (1989); *accord Teesdale v. City of Chicago*, 690 F.3d 829, 833 (7th Cir. 2012).

Hardy alleges that Wexford (1) failed to train its employees; (2) failed to properly staff Stateville's medical unit; (3) failed to provide timely prescription medication refills; and (4) failed to provide prescription medication refills and therapy sessions during lockdowns. R. 85 ¶¶ 75-78; R. 103 at 18-21. Hardy alleges he was harmed as a result of these policies. *Id.*

### 1. Failure to Train and Failure to Provide Adequate Staffing

"A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train." *Connick v. Thompson*, 131 S. Ct. 1350, 1360 (2011). "The failure to provide adequate training to its employees may be a basis for imposing liability on a municipality or private corporation, but as with any other policy or practice for which the plaintiff seeks to hold the municipal or corporate defendant liable, the plaintiff must show that the failure to train reflects a conscious choice among alternatives that evinces a deliberate indifference to the rights of the individuals with whom those employees will interact." *Rice*, 675 F.3d at 675. "This pattern, or recurring string of related unconstitutional conduct, is necessary because it establishes that policymakers know or should have known that their employees' training was deficient." *Winchester v. Marketti*, 2012 WL 2076375, at *4 (N.D. Ill. June 8, 2012).

Similarly, the Seventh Circuit has stated that "systematic deficiencies in staffing, facilities, or procedures [that] make unnecessary suffering inevitable" may demonstrate deliberate indifference. *See Wellman v. Faulkner*, 715 F.2d 269, 272 (7th Cir. 1983). The plaintiff must prove that "there are such systematic and gross deficiencies in staffing, facilities, equipment, or procedures that the inmate population is effectively denied access to adequate medical care." *Id.*

Hardy alleges that Wexford's "employees were not adequately trained on how to process and treat inmates with serious medical conditions," and that Wexford "failed to train, supervise, and discipline health-care-unit employees who neglected the needs of inmates at Stateville." R. 85 ¶ 76. Hardy does not allege any other facts with respect to Wexford's alleged failure to train or provide adequate staffing. Hardy also does not allege any incidents that demonstrate training or staffing inadequacies resulted from a Wexford policy or practice. *See Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985) ("it is therefore difficult in one sense even to accept the submission that someone pursues a 'policy' of 'inadequate training' unless evidence is adduced which proves that the inadequacies resulted from the conscious choice—that is, proof that the policymakers deliberately chose a training program which would prove inadequate"); *Wellman*, 715 F.2d at 272-73 (finding gross deficiencies in staffing that demonstrated deliberate indifference where the position of staff psychiatrist was unfilled for two years and prisoners had to wait years to be treated). Absent allegations of what training or staffing was lacking and how that deficiency impacted Hardy's health or that of his fellow inmates, Hardy has failed to

state a claim for deliberate indifference due to a failure to train and a failure to provide adequate staffing.

Hardy argues that his allegations against particular doctors of inadequate medical treatment for his serious conditions are a sufficient basis to state a claim for failure to train and provide adequate staffing. But there could be many reasons Hardy did not receive adequate medical care, obviously including Hardy's allegation that the doctors treating him were indifferent to his medical needs. Other than baldly stating that a lack of training and insufficient staffing led to his inadequate medical care, Hardy has not alleged any facts from which the Court can reasonably make such an inference. *See Winchester*, 2012 WL 2076375, at *4 ("given [a failure to train claim's] 'nebulous' nature, it would seem that a relatively high level of factual specificity is required at the pleading state to make a failure to train claim facially plausible" (quoting *Tuttle*, 471 U.S. at 822)).

Moreover, Hardy has only made allegations regarding conduct directed at him. "[I]t is necessarily more difficult for a plaintiff to demonstrate an official policy or custom based only on his own experience because what is needed is evidence that there is a true municipal policy at issue, not a random event." *Grieveson v. Anderson*, 538 F.3d 763, 774 (7th Cir. 2008). For this reason, courts in this district generally dismiss *Monell* claims in which "[a]ll of the allegations in the Complaint pertain exclusively to [the plaintiff]." *Davis v. Metro. Pier & Exposition Auth.*, 2012 WL 2576356, at *12 (N.D. Ill. July 3, 2012); *see also Lewis v. County of Cook*, 2011 WL 839753, at *14 (N.D. Ill. Feb. 24, 2011) (dismissing *Monell* claim because the

plaintiff "does not allege facts supporting retaliatory conduct against anyone other than herself"); *Travis v. City of Chicago*, 2012 WL 2565826, at *5 (N.D. Ill. June 29, 2012) ("although [the plaintiff] states that he himself made complaints, he does not identify any other people who complained to the City"). The Court cannot reasonably infer that a failure to train or a failure to adequately staff caused Hardy's alleged injuries based on his individual experiences. Thus, his failure to train and failure to staff claims are dismissed.

### 2. Practice Regarding Prescription Medication Refills

Hardy alleges that "Stateville and Defendant Wexford have a policy of not permitting an inmate to renew a medication until at most seven days' worth of medication remain," and "Stateville's and Defendant Wexford's officials . . . frequently take longer than a week to order and provide prescription refills . . . leav[ing] inmates, including Mr. Hardy, without medication for days at a time." R. 85 ¶ 72. Despite his allegation that Wexford's prescription refill policy has left him and other inmates "without medication for days at a time," Hardy does not specifically allege instances when the policy has left him or anyone else without sufficient medication. Absent such details, Wexford cannot adequately respond to this allegation. If Hardy chooses to re-plead this claim, he must be able to describe when this policy has deprived him (and others) of medication and the harm such deprivations have caused.

### 3. Practice Regarding Prescription Medication Refills and Therapy Sessions During Prison Lockdowns

Hardy also alleges that "[d]uring lockdowns, prisoners including Mr. Hardy were not allowed to visit the health care unit to renew expiring psychotropic prescriptions or allowed to attend therapy sessions." R. 85 ¶ 67. Hardy alleges that he was deprived of his medications and therapy during lockdowns that occurred June 10 through 27, 2012, and July 11 through August 3, 2012. *Id.* ¶¶ 67-69. Hardy alleges that this deprivation caused him "physical pain and mental distress." He also alleges that his mother passed away on July 10, which caused him to feel "distressed and suicidal" when he was deprived of medication and therapy during the lockdown that lasted from July 11 through August 3, 2012.

These allegations are sufficient to state a claim for deliberate indifference against Wexford. Hardy has alleged specific instances during which he was deprived of medication and therapy during a lockdown for periods of weeks. R. 85 ¶¶ 66-67. Hardy has not specifically alleged that other inmates were also deprived of medication or therapy during lockdowns, but Hardy has alleged that the deprivation of medication and therapy was a result of a policy or practice during lockdowns as opposed to a circumstance particular to his individual experience. The Court can reasonably infer that all inmates would be subject to the same restrictions.

Wexford argues that "there are no *facts* to suggest that general practitioners have the ability to intervene during a lockdown to renew medication and/or cause therapy sessions to take place." R. 92 at 18 (emphasis added). This argument fails.

In addition to the fact that Hardy's allegations, and not a factual record, control the outcome of this motion, the power of individual doctors to control policies during lockdowns is not relevant to Hardy's claim. Rather, it is Wexford's ability to influence Stateville's policy regarding the treatment of serious medical conditions that is at issue. Wexford has a contract with Stateville. Wexford has the power to dictate under what circumstances inmates will receive certain care and treatment. After all, they are the medical professionals, not the prison authorities. Presumably inmates at Stateville receive some medical treatment during lockdowns, so Wexford's suggestion that it is impossible to provide adequate medical treatment during lockdowns is implausible, at least at this stage of the case. While prisoner freedoms may be reasonably restricted at the discretion of prison officials during lockdowns, prisoners' constitutional right to have serious medical conditions treated is not suspended. If the facts eventually show that Wexford knew Stateville prevented inmates from accessing medication and therapy during lockdowns and failed to attempt to alter this policy, a reasonable jury could find that such a failure constituted deliberate indifference. Hardy's allegations are sufficient to permit discovery on this issue.[7]

---

[7] Hardy's allegations attribute this policy to "Stateville" as well as "Defendant Wexford." R. 85 ¶ 72. Stateville and its officials in their official capacities are immune to claims for monetary relief under the Eleventh Amendment, *see Wynn v. Southward*, 251 F.3d 588, 592 (7th Cir. 2001), but not necessarily to a claim for injunctive relief. *See Williams v. Wisconsin*, 336 F.3d 576, 581 (7th Cir. 2003) ("Official-capacity suits against state officials seeking prospective relief are permitted by § 1983 (citing *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 n.10 (1989))); *see also Johnson v. Godinez*, 2015 WL 135103, at *6 (N.D. Ill. Jan. 9, 2015) ("By naming IDOC as a defendant and seeking injunctive relief, the Eleventh

**Count II – Intentional Infliction of Emotional Distress**

In Count II, Hardy alleges that Wexford and the six doctor defendants intentionally inflicted emotional distress upon him in violation of Illinois law. R. 85 ¶¶ 171-79. The elements of a claim for intentional infliction of emotional distress under Illinois law are the following: "(1) the defendants' conduct was extreme and outrageous; (2) the defendants knew that there was a high probability that their conduct would cause severe emotional distress; and (3) the conduct in fact caused severe emotional distress." *Swearnigen-El v. Cook Cnty. Sheriff's Dep't*, 602 F.3d 852, 864 (7th Cir. 2010) (citing *Kolegas v. Heftel Broad. Corp.*, 607 N.E.2d 201, 211 (Ill. 1992)). "To meet the 'extreme and outrageous' standard, the defendants' conduct 'must be so extreme as to go beyond all possible bounds of decency, and to be regarded as intolerable in a civilized community.'" *Swearnigen–El,* 602 F.3d at 864 (quoting *Kolegas,* 607 N.E.2d at 211). In determining whether conduct meets the "extreme and outrageous" standard, courts consider three main factors: (1) "the more power or control the defendant has over the plaintiff, the more likely the conduct will be deemed extreme"; (2) "whether the defendant reasonably believed its objective was legitimate"; and (3) "whether the defendant was aware the plaintiff was 'peculiarly susceptible to emotional distress, by reason of some physical or

---

Amendment poses no obstacle to Plaintiff's claim for relief."). Hardy seeks injunctive relief in that he seeks "[s]ufficient and timely medical treatment, including timely refilled prescriptions and therapy." R. 85 at 30. Nevertheless, Hardy's complaint does not name "Stateville" as a defendant (in the caption or the body of the complaint), and Hardy has sued Warden Hardy and Director Godinez in their individual capacities only. *Id.* ¶¶ 6, 8. Thus, despite Hardy's reference to policies of "Stateville," the Court does not consider Stateville or any other subdivision or representative of the State of Illinois to be a defendant in this case.

mental peculiarity.'" *Franciski v. Univ. of Chi. Hosp.,* 338 F.3d 765, 769 (7th Cir. 2003) (quoting *McGrath v. Fahey,* 533 N.E.2d 806, 811 (1998)). The Illinois Supreme Court has explained, "Conduct is of an extreme and outrageous character where recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" *Doe v. Calumet City*, 641 N.E.2d 498, 507 (Ill. 1994).

To the extent the Court has held that Hardy has stated a claim for deliberate indifference, the Court also finds that Hardy has alleged extreme and outrageous conduct. Depending on the factual circumstances that are adduced during discovery, a delay in medical care for a serious injury could be considered "to go beyond all possible bounds of decency, and to be regarded as intolerable in a civilized community." *Swearnigen–El,* 602 F.3d at 864 (quoting *Kolegas,* 607 N.E.2d at 211).

The Court also finds, however, that Hardy has failed to allege that he suffered "severe emotional distress" as a result of the alleged delays in care for his difficulty and pain urinating, his injured right ring finger, and injured eye.[8] The Court held that that these injuries were "serious" because they implicated the continued proper functioning of parts of Hardy's body. But the pain Hardy alleges he has suffered from these injuries is not such that "no reasonable man could be expected to endure it." Hardy's allegations describe medical conditions more akin to chronic—albeit unpleasant—conditions, as opposed to emergent conditions that

---

[8] Hardy has failed to allege "severe emotional distress" due to his shoulder injury for the same reasons he failed to allege it was a "serious" injury for Eighth Amendment purposes.

could be described as severe. Hardy has not alleged that any of these injuries were so severe that any delay in adequate treatment deprived him of proper functioning of any part of this body, from which the Court could reasonably infer that Hardy suffered severe emotional distress. Rather, Hardy's allegations imply that with proper treatment, his conditions will be alleviated. Such medical conditions are not so severe as to support a claim for intentional infliction of emotional distress.

On the other hand, Hardy's allegation that he has been deprived of medication and therapy sessions during lockdowns states a claim for intentional infliction of emotional distress. Hardy alleges that he suffers from "bipolar disorder, schizophrenia, and attention deficit disorder," and that he "takes numerous medications for these disorders," and "regularly attends therapy sessions." R. 85 ¶ 64. These allegations demonstrate that Hardy is "peculiarly susceptible to emotional distress" resulting from deprivation of these medications and therapies. Furthermore, Hardy's medical conditions are sufficiently severe that it could be considered "outrageous" for him to be deprived of the medications and therapies necessary to manage his conditions. Accordingly, the Court denies Wexford's motion to dismiss Hardy's intentional infliction of emotional distress claim with regard to his allegation that he has been deprived of medication and therapy sessions during lockdowns.

## Conclusion

For the foregoing reasons, Defendants' motion to dismiss, R. 91; R. 95, is granted in part and denied in part. The following of Hardy's claims are dismissed without prejudice:

- any claim with respect to Hardy's shoulder;

- any claim with respect to Hardy's eye;

- all claims against Warden Hardy;

- all claims against Director Godinez;

- all intentional infliction of emotional distress claims against all of the individual defendants;

- the deliberate indifference claims against Dr. Ghosh alleging that he failed to ensure that (i) Hardy received adequate medical care from other doctors for his difficulty and pain urinating and his right ring finger, and (ii) that Hardy received timely medication refills and therapy sessions during lockdowns;

- the deliberate indifference claim against Dr. Shute concerning his treatment of Hardy's right ring finger;

- the deliberate indifference claim against Dr. Funk concerning his treatment of Hardy's right ring finger;

- the deliberate indifference claim against Dr. Obaisi concerning his treatment of Hardy's difficulty and pain urinating;

- the deliberate indifference claims against Dr. Shute, Dr. Funk, and Dr. Obaisi that they failed to ensure that Hardy received timely medication refills and therapy sessions during lockdowns; and,

- any claims against Wexford regarding a failure to train, a failure to staff, and a failure to provide timely medications.

Additionally, the following of Hardy's claims remain:

- the deliberate indifference claim against Dr. Ghosh concerning his treatment of Hardy's difficulty and pain urinating;

- the deliberate indifference claim against Dr. Schaefer concerning his treatment of Hardy's difficulty and pain urinating;

- the deliberate indifference claim against Dr. Carter concerning his treatment of Hardy's difficulty and pain urinating;

- the deliberate indifference claims against Dr. Obaisi concerning his treatment of Hardy's right ring finger;

- the deliberate indifference claims against Dr. Shute, Dr. Funk, and Dr. Obaisi regarding their failures to ensure that Hardy received adequate medical care from other doctors for his difficulty and pain urinating and his right ring finger; and,

- the deliberate indifference and intentional infliction of emotional distress claims against Wexford regarding its failure to ensure that Hardy received timely medication refills and therapy sessions during lockdowns.

Hardy is granted leave to file a second amended complaint by May 5, 2015 if he believes he can cure the deficiencies described by this opinion and order. A status hearing is scheduled for June 10, 2015 to discuss next steps in this case.

ENTERED:

_Thomas M Durkin_

Honorable Thomas M. Durkin
United States District Judge

Dated:  April 2, 2015